UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: __11.14.18__

ENRIQUE GARCIA,

        Plaintiff,

-against-

NANCY A. BERRYHILL, Acting
Commissioner of Social Security,

        Defendant.

17-CV-10064 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Plaintiff Enrique Garcia brings this action pursuant to § 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), seeking judicial review of a final determination of the Commissioner of Social Security (Commissioner) denying his application for Disability Insurance Benefits (DIB). Both parties have moved for judgment on the pleadings. As discussed in more detail below, the Administrative Law Judge (ALJ) gave "great weight" to the opinion of a non-examining medical expert but failed to incorporate significant limitations found by that expert into his residual functional capacity (RFC) determination. In addition, the ALJ wholly failed to consider the opinion of the consultative examiner who evaluated plaintiff in connection with his DIB application. Because the ALJ erred in formulating plaintiff's RFC, there is no record evidence showing that plaintiff could perform jobs that exist in significant number in the national economy. Consequently, plaintiff's motion will be granted, the Commissioner's motion will be denied, and the case will be remanded.

## I. BACKGROUND

### A. Procedural Background

Plaintiff filed his DIB application on December 6, 2013, alleging disability as of August 13, 2013, when he fell off a ladder at work and injured his right shoulder. *See* Certified Administrative Record (Dkt. No. 12) at 136, 140 (hereinafter "R. __.") His application was denied

on April 1, 2014. (R. 147.) Plaintiff timely requested a hearing before an ALJ (R. 159), and on December 10, 2015, he appeared with counsel before ALJ Seth Grossman. (R. 77-88.) No other witnesses testified. On August 19, 2016, Plaintiff appeared again, with counsel, for a second hearing before ALJ Grossman. (R. 89-130.) At the second hearing, the ALJ also took testimony from orthopedic surgeon Allan Levine, M.D. and vocational expert Joseph Atkinson. (R. 98-114, 121-29.)

In a written decision dated October 13, 2016 (Decision), the ALJ found that plaintiff was not disabled within the meaning of the Act. (R. 39-47.) Plaintiff timely requested review of the ALJ's Decision, but on October 26, 2017, the Appeals Council denied his request. (R. 5-10.) This was the final act of the Commissioner.

### B. Personal Background

Plaintiff was born on February 11, 1968, in Peru. (R. 82, 131.) He completed high school in Peru. (R. 82.) He moved to the United States in 1989, when he was 21, and is now a U.S. citizen. (R. 80-81, 118-19.) Once in the United States, plaintiff worked first as a taxi driver and later in asbestos removal. (R. 350.) On August 13, 2013, he fell off a ladder while working, sustaining an injury to his right shoulder. (R. 94-95, 136.) Plaintiff is right handed. (R. 136.)

Plaintiff has not engaged in any gainful activity since the date of his injury. (R. 41.) He has undergone two shoulder surgeries (R. 438, 700), and continues to complain of pain in his upper right extremity. In a function report completed in connection with his application for DIB, plaintiff reported that he did not do chores or prepare meals, and had difficulty with personal care, because he was limited to his (non-dominant) left hand. (R. 319-21.)

## II.    PLAINTIFF'S MEDICAL HISTORY

### A.    Treatment Records

On August 14, 2013, the day after his accident, plaintiff was seen for an initial evaluation by orthopedic surgeon Darren J. Friedman, M.D. (R. 435-37.) A CT scan of his right shoulder showed a proximal humerus fracture. (R. 436.) On August 15, 2013, plaintiff underwent a "subacromial decompression with partial acromioplasty," "ORIF proximal humerus," and "open rotator cuff repair." (R. 438.) In an August 19, 2013 post-operative note, Dr. Friedman prescribed physical therapy and Vicodin. (R. 441.) On September 11, 2013, Dr. Friedman noted that plaintiff was "doing well" and could "continue with work light duty." (R. 442.) On October 9, 2018, however, Dr. Friedman noted that plaintiff continued to complain of pain "which radiates from the shoulder down to the hand and wrist." (R. 542.)

On November 5, 2013, an x-ray of plaintiff's wrist and elbow showed mild degenerative changes without acute bony abnormalities. (R. 460-61.) On November 19, 2013, plaintiff was diagnosed with right elbow medial epicondylitis and given an injection in his elbow. (R. 428-29.) On December 4, 2013, an MRI showed tendinosis of the right elbow. (R. 515-16.)

On December 9, 2013, Dr. Friedman saw plaintiff and noted improved "motion," but the patient continued to complain of pain in the right shoulder. (R. 444.)

On February 7, 2014, Dr. Friedman certified that plaintiff was "totally disabled" for the two-month period between February 7, 2014 and April 7, 2014. (R. 506.) On April 7, 2014, Dr. Friedman again saw plaintiff, who reported that his pain had returned after a February 12, 2014 corticosteroid injection which had offered him mild transient benefits. (R. 686.) On May 19, 2014, Dr. Friedman noted that plaintiff wished to proceed with a second surgery once it was approved by his workers' compensation provider. (R. 690-91.)

On July 18 and September 5, 2014, plaintiff saw neurologist Aric Hausknecht, M.D. Dr. Hausknecht prescribed a trial of Lyrica. (R. 761, 764.)

On September 18, 2014, plaintiff underwent surgery on his right shoulder for "removal of hardware" and "total shoulder arthroplasty." (R. 700.) During post-operative visits with Dr. Friedman on September 26, 2014, October 24, 2014, and January 2, 2015, plaintiff was generally observed to be doing well. (R. 706, 710, 714.) He also continued to visit Dr. Hausknecht for pain management during this time. (R. 767, 770.)

On January 29, 2015, plaintiff was seen by neurologist and pain management physician Douglas Schottenstein, M.D. (R. 795-99.) Dr. Schottenstein's notes reflect a "plan" for plaintiff to continue to undergo physical therapy, to continue taking pain medication per Dr. Hausknecht, and to continue to see Dr. Friedman for shoulder, elbow, and hand pain. (R. 798.)

Throughout 2015, plaintiff continued to report varying amounts of pain. On March 6, 2015, when he visited Dr. Hausknecht, his prognosis was "guarded." (R. 777.) On April 6, 2015, Dr. Friedman noted that plaintiff was "making progress" and recommended continued physical therapy. (R. 718.) On April 23, 2015, Dr. Schottenstein noted "continued right wrist and hand pain" but wrote that plaintiff obtained "70% relief" from stellate ganglion blocks (injections for pain). (R. 825.) On June 26, 2015, plaintiff stopped taking Lyrica, due to dizziness, and began taking Neurontin. (R. 783.) On June 29, 2015, Dr. Schottenstein reported that plaintiff's motor strength in his upper extremities was "5/5 on standard manual resistance technique" except for his right upper extremity, "which is 5-/5." (R. 846.)

On August 28, 2015, Dr. Hausknecht increased plaintiff's dosage of Neutontin. (R. 786.) On October 13, 2015, the patient reported continued pain. (R. 855.) On November 13, 2015, Dr.

Hausknecht again increased plaintiff's dosage of Neutontin. (R. 959.) On December 15, 2015, plaintiff again reported continued pain. (R. 929.)

On December 28, 2015, plaintiff saw physical therapist Mital Patik Saparia. (R. 973.) Ms. Saparia's diagnosis included "MS wasting on anterior deltoids" – *i.e.,* muscle atrophy. (*Id.*)

Throughout the first half of 2016, plaintiff continued to see Drs. Hausknecht and Schottenstein. (R. 956, 905, 953, 950, 869, 981.) During this period, Dr. Schottenstein continued to provide plaintiff with semi-regular injections (once every month or two), of "right stellate ganglion blocks" to address his pain. (R. 789, 817, 821, 837, 851, 943, 921, 889.) Dr. Schottenstein noted some temporary improvement from those injections, but he also reported, as late as May 11, 2016, that plaintiff had "worsen[ing]" pain. (R. 869.)

### B.    Medical Opinion Evidence

Numerous physicians have provided written or testimonial opinion evidence concerning plaintiff's ability to work. Two of them – Dr. Levine and family medicine physician John Fkiaras, M.D. – provided their opinions in connection with plaintiff's application for DIB benefits. Six other doctors provided their opinions in connection with plaintiff's workers' compensation applications.

### 1.    Dr. John Fkiaras

Dr. Fkiaras performed a consultative internal medicine examination of plaintiff on March 14, 2014, in connection with his DIB application. (R. 480-83.) Plaintiff's physical exam was normal except for his upper right extremity, where Dr. Fkiaras found a decreased range of motion in the shoulder, elbow, and wrist, "decreased sensation to light touch in the right hand[]," and "3/5 muscle strength in the right upper extremity." (R. 482.) Dr. Fkiaris also noted that plaintiff could "zip, button and tie with the right hand with difficulty." (*Id.*) In a medical source statement, Dr. Fkiaras wrote that plaintiff was "restricted from any lifting, carrying, pushing, and pulling," that

he was "unable to participate in activities which require reaching with his right upper extremity," that he had "a moderate to severe limitation grabbing and squeezing with his right hand," and that he was "restricted from activities which require use of his right upper extremity." (R. 483.)

### 2. Dr. Allan Levine

Dr. Levine, who did not personally examine the plaintiff, testified as a medical expert at the second ALJ hearing on August 19, 2015. (R. 98.) As discussed in greater detail below, Dr. Levine concluded, based on plaintiff's testimony and medical records, that he was limited to lifting ten pounds occasionally and that he could not do "any pushing or pulling," any "reaching above shoulder level," or any "forceful grip, grasp, or torque activities" with his upper right extremity. (R. 110-12.)

### 3. Dr. Robert D. Kramberg

Pain management specialist Robert D. Kramberg, M.D. completed a progress report on November 6, 2013, after giving plaintiff a corticosteroid injection to his right shoulder. (R. 573-74.) This was approximately three months after plaintiff's first shoulder surgery. Dr. Kramberg reported that plaintiff had a 25% "temporary impairment." (R. 574.) In addition, Dr. Kramberg checked a box indicating that plaintiff was working at the time of the report (which is not otherwise supported in the record). (R. 574.) Dr. Kramberg also twice referenced an "attached medical report" which appears to be missing from the record.[1] Insofar as the record reveals, plaintiff did not visit Dr. Kramberg again.

---

[1] The two record pages following Dr. Kramberg's report are slip sheets indicating that the pages were "replaced with [these pages] because [they] referenced another individual." (R. 573-576.)

### 4. Dr. Vincent Huang

Physical medicine and rehabilitation specialist Vincent Huang, M.D. authored a "Certificate of Disability" concerning plaintiff on December 2, 2013. (R. 433.) Dr. Huang opined that plaintiff was "unable to return to work." (*Id.*) Insofar as the record reveals, plaintiff did not visit Dr. Huang again.

### 5. Dr. Alexios Apazidis

Orthopedic surgeon Alexios Apazidis, M.D., performed an independent orthopedic examination of plaintiff on December 19, 2013. (R. 448-56.) Dr. Apazidis opined that plaintiff had a "marked (75%) disability," based on "the physical examination at this time" and the "available medical documentation." (R. 451.)

Dr. Apazidis performed a second examination of plaintiff on April 24, 2014 (R. 642-45), after which he reported limitations in flexibility in plaintiff's right shoulder but opined that plaintiff was capable of working, so long as he did not work "at or above shoulder level with the right arm." (R. 644.)

### 6. Dr. Howard V. Katz

Orthopedic surgeon Howard V. Katz, M.D. performed three evaluations of plaintiff between August 2014 and August 2015, each for workers' compensation purposes. (R. 725-49.) On August 26, 2014, Dr. Katz opined that plaintiff and was capable of working "with restrictions of no repetitive use of [the] right arm, no pushing, no pulling, and no heavy lifting over 40 pounds." (R. 728.) On April 20, 2015, Dr. Katz opined that plaintiff could perform sedentary work with "no overhead repetitive use of the right arm" and "[n]o pushing, pulling and lifting over 15 lbs." (R. 737.) On August 31, 2015, Dr. Katz noted that plaintiff had reached "maximal medical improvement" and opined that he was capable of working "with restrictions." (R. 745.) Dr. Katz did not identify those restrictions. (*Id.*)

### 7. Dr. Maury Harris

Orthopedic surgeon Maury Harris, M.D. performed an independent orthopedic evaluation of plaintiff on February 11, 2016. (R. 960-69.) Dr. Harris reported that plaintiff could perform light or sedentary duties, "with restrictions placed on any lifting over 20 lbs., and any overhead repetitive movement." (R. 966.) In an April 1, 2016 addendum, Dr. Harris reported a "schedule[d] loss" of 50% in plaintiff's right shoulder. (R. 961.)

### 8. Dr. Douglas C. Schottenstein

Treating physician Dr. Schottenstein completed an evaluation form for workers' compensation purposes on April 4, 2016, based on his March 23, 2016 examination of plaintiff. (R. 901.) Dr. Schottenstein reported in relevant part that plaintiff should "avoid pushing, pulling, lifting, carrying >10-15 lbs." (R. 901.)

## III. HEARING

### A. December 10, 2015 Hearing

At the December 10, 2015 hearing, plaintiff testified, through a Spanish translator, that he was 47 years old, that he entered the United States from Peru in 1989, that he became a U.S. citizen, and that he understood basic English. (R. 80-81.) Plaintiff confirmed that he took his U.S. citizenship test in English. (R. 81.)

In response to the ALJ's questions, plaintiff testified that he could not "do any heavy lifting" with his right hand and arm, stating "I can't do a lot of movements because I get pain." (R. 83.) When asked if he could lift a gallon of milk with his right hand, he testified "I can pick it up but I cannot sustain it" for more than "one to two minutes" before he "[got] pain." (*Id.*) When asked by the ALJ if there was anything wrong with him besides his right hand and arm, plaintiff said no. (R. 83) He testified that he could walk five miles and could drive short distances with his left hand. (R. 83, 85.)

The ALJ then questioned plaintiff's attorney about the merits of plaintiff's disability claim, stating "Counsel, to be blunt about it and, you know, it's – it's really hard to make out a case of disability" with nothing more than "limited use of your arm." (R. 84.) However, the ALJ concluded that the case required "another hearing with the [vocational expert]." (R. 86.)

### B.     August 19, 2015 Hearing

At the August 19, 2015 hearing, the ALJ heard live testimony from plaintiff and telephonic testimony from Dr. Levine and VE Atkinson. (R. 89-130.) Dr. Levine was present by telephone for all of plaintiff's testimony (R. 93-94), but Mr. Atkinson was not. (R. 118.)

### 1.     Plaintiff's Testimony

Plaintiff once again testified through a Spanish interpreter. He stated that he remained unemployed, and described the moment of his right upper extremity injury as when his "shoulder broke." (R. 94-95.) He noted again that he is right handed. (*Id.*)

Asked by the ALJ about the state of his right arm, plaintiff testified that it was "very bad." (R. 95.) He could lift it only up to desk level. (*Id.*) He could dial on a cell phone but would not pick up that cell phone with his right hand. (*Id.*) He drove "with one hand," though he acknowledged that he could use his right hand to hold the steering wheel momentarily while turning with his left hand. (R. 96.) He thought he could lift 20 pounds with his left hand. (R. 97.) Asked by his own attorney what other activities he had "problems doing" with his right shoulder, arm, or hand, plaintiff responded "I can't barely do anything with that arm." (R. 98.)

Medical expert Dr. Levine also questioned plaintiff. In response, plaintiff testified that he had pain in his right elbow, and that his shoulder had not gotten better after shoulder replacement surgery. (R. 100-01.) Plaintiff stated that he could use his right hand to feed himself, and could hold a cup of coffee with his right hand, but could not write "that much" with his right hand because his hand hurt. (R. 101.)

### 2. Dr. Levine's Testimony

After questioning plaintiff, Dr. Levine testified that plaintiff "had a medically-determinable impairment of chronic pain in the right shoulder secondary to a fracture of the proximal right humerus [], and a rotator cuff tear and development of degenerative joint disease of the shoulder and that was in 8/13/2013." (R. 102.) Dr. Levine testified that plaintiff had a second medically-determinable impairment of chronic pain of the right elbow and a third medically-determinable impairment of "chronic pain in the right wrist and hand." (R. 103-04.) He testified that "the medical records are replete with [reports of] chronic pain of the right shoulder since his on-the-job injury in August 2013." (R. 102.)

However, according to Dr. Levine, the record did not show signs of "complex regional pain syndrome" (R. 105-06), and there was "a question" as to whether plaintiff had "a medically-determinable impairment" based on a diagnosis of "chronic pain syndrome." (R. 106.) Dr. Levine noted that plaintiff had found some relief with ganglion blocks and that a recent EMG and nerve conduction study of his right upper extremity was normal. (R. 107.)

When asked by the ALJ what use plaintiff had of his right upper extremity, Dr. Levine stated that plaintiff had "minimal to no use really of the shoulder itself," but retained some use of his right hand. (R. 108, 112-13.) Dr. Levine explained that "with the upper arm at its side it effectively takes the shoulder out of the equation and it has no effect on fine and gross manipulation." (R. 109.)

Based on his review of the medical record and plaintiff's testimony, Dr. Levine opined that plaintiff should not engage in "any lifting more than occasionally, ten pounds with the right alone," any "lifting above chest level with the right," or any "pushing or pulling with the right upper extremity," but that he could "sit, stand or walk six out of eight hours with customary breaks," with "unlimited stairs or ramps, [] kneeling, crouching, or stooping." (R. 110-11.) Dr. Levine

added that plaintiff should avoid "ladders, scaffolds, [] crawling, heavy vibratory machinery or dangerous-type equipment, [] unprotected heights and extreme cold exposure," should not "reach[] above shoulder level with the right," and should avoid "any forceful grip, grasp or torque activities with the right upper extremity." (R. 111-12.)

Other than these restrictions, Dr. Levine testified that plaintiff "had unlimited use of the upper extremities for fine and gross manipulation." (R. 112-13.) Dr. Levine clarified that plaintiff should be able to use both hands for things like picking up a receiver and writing. (R. 113.) Dr. Levine also opined that plaintiff's "limitations are primarily in and/or around the shoulder itself. If he can do things without involving the shoulder such as even putting his hand on a desk and writing, that really does not affect the shoulder." (R. 113.)

### 3.    VE Atkinson's Testimony

VE Atkinson testified by telephone. (R. 118.) Before questioning the VE, the ALJ again questioned plaintiff – with Mr. Atkinson on the line – about his English language ability. (R. 118-19.) Plaintiff restated that he took his citizenship test in English and that he could carry on a basic/simple conversation in English "a little bit." (R. 119.) Asked about his ability to read simple instructions in English, he responded, "It depends; sometimes there are difficult words that I don't understand." (*Id.*)

The ALJ asked VE Atkinson to identify jobs for two hypothetical claimants. The first was:

A hypothetical person of the claimant's educational and vocational background who can carry on a simple conversation in English, basic English skills and this person has – well, this is the most extreme, the person had – can stand or walk six hours and sit six hours in an eight-hour day. The person can lift and carry 20 pounds with their upper extremity frequently, 10 pound – or, I'm sorry 10 – 20 pounds occasionally and 10 pounds frequently and *no use of the right upper extremity*.

(R. 121-22) (emphasis added). The ALJ asked whether this hypothetical claimant could perform any light jobs. (R. 122.)

After a period of silence from Mr. Atkinson, the ALJ prompted him, asking whether the hypothetical claimant could perform the job of usher (DOT code 344.677-014, light work, SVP of 2). (R. 122-23.) Mr. Atkinson testified that "[i]t would be difficult," given that ushers "have to hand out pamphlets and things like that and hold pamphlets." (R. 122.) He continued, "I would say the individual could perform the occupation of usher, but we would have a significant erosion." [2] (R. 122.) VE Atkinson estimated the erosion to the national employment figure of usher (4,823) at 50 percent. (R. 123.)[3]

Mr. Atkinson then opined that the first hypothetical claimant could also perform the job of school bus monitor (DOT code 372.667-042, light work, SVP of 2), though the national employment for that job (1,081) would be eroded by 60 percent. (R. 124.) VE Atkinson further opinioned that the first hypothetical claimant could perform the job of monitor (DOT code 379.367-010, sedentary work, SVP of 2), though the national employment for that job (4,558) would also be eroded 50 to 60 percent. (R. 125.)

The ALJ then provided VE Atkinson a second hypothetical, involving the same limitations as the first, except that the claimant had some additional use of the upper right extremity:

> [W]ith the right arm this person is limited in the following manner. This person has no over-shoulder lifting and is limited – just a second, the person can lift ten pounds

---

[2] Social Security Administration regulations provide that ALJs must consider "the extent of any erosion of the occupational base" when a claimant has limitations preventing him or her from performing the full range of light or sedentary work. SSR 83-12, 1983 WL 31253 (S.S.A. 1983); *see also* Carolyn A. Kubitschek & Jon C. Dubin, *Social Security Disability Law and Procedure in Federal Court* § 3:94 (2018) (noting that vocational expert testimony is required where the "extent of the erosion of the occupational base is not clear."). Thus, vocational experts often testify, as VE Atkinson did here, concerning the extent to which the number of jobs otherwise available in a particular occupation should be "eroded" (reduced) due to a claimant's specific limitations. *See, e.g.*, *Glast v. Astrue*, 2013 WL 5532696, at *6 (E.D.N.Y. Sept. 30, 2013); *Crossman v. Comm'r of Soc. Sec.*, 2015 WL 5943506, at *19 (N.D.N.Y. Oct. 13, 2015).

[3] The ALJ and VE Atkinson then agreed that the resulting figure, after erosion, was "about 1,500 jobs." (R. 123.) It is not clear from the record why this figure differed from 50 percent of 4,823 (*i.e.*, 2,411).

to the chest level, in other words no more than that, with no overhead lifting but the person can finger, handle, you know, fine manipulation frequently."

(R. 125-26.) The ALJ elaborated: "So that the main problems are no overhead lifting with the right and no lifting more than ten pounds at chest level." (R. 126.)

In response, Mr. Atkinson opined that this second hypothetical claimant could perform the jobs of electronics worker (DOT code 726.687-010, light work, SVP of 2, national employment figure of 3,437), office helper (DOT code 239.567-010, light work, SVP of 2, national employment figure of 3,728), information clerk (DOT code 237.367-018, light work, SVP of 2, national employment figure of 1,609), or ticket taker (DOT code 344.667-010, SVP of 2, national employment figure of 6,785). (R. 126-28.) Mr. Atkinson added that the second hypothetical claimant – like the first – could perform the job of usher, but without any erosion. (R. 127-28.)

## IV.    ALJ DECISION

### A.    Standards

A five-step sequential evaluation process is used pursuant to 20 C.F.R. § 404.1520(a) to determine whether a claimant over the age of 18 is disabled within the meaning of the Act. The Second Circuit has described the sequence as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1 . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity [RFC] to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Jasinski v. Barnhart*, 341 F.3d 182, 183-84 (2d Cir. 2003) (citation omitted).

If it is determined that the claimant is or is not disabled at any step of the evaluation process, the evaluation will not progress to the next step. 20 C.F.R. § 404.1520(a)(4). A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the fifth step. *See Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). To support a finding that the claimant is not disabled at step five, the Commissioner must offer evidence demonstrating that other work exists in significant numbers in the national and local economies that the claimant can perform, given the claimant's RFC, age, education, and past relevant work experience. *See* 20 C.F.R. §§ 404.1512(f) (2015), 404.1560(c). "Under the law of this Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the step five burden." *Lacava v. Astrue*, 2012 WL 6621731, at *18 (S.D.N.Y. Nov. 27, 2012) (citations omitted), *report and recommendation adopted*, 2012 WL 6621722 (S.D.N.Y. Dec. 19, 2012).

For steps four and five, the ALJ must also determine the claimant's RFC. The ALJ must make this determination based on all of the relevant medical and other evidence in the record, including the claimant's credible testimony, the objective medical evidence, and medical opinions from treating and consulting sources. 20 C.F.R. §§ 404.1520(e), 404.1545(a)(3). An ALJ must consider all medical evidence on the record. 20 C.F.R. § 404.1527(c)(1) ("Regardless of its source, we will evaluate every medical opinion we receive.").

**B.      Application of Standards**

At step one, the ALJ found that plaintiff has not engaged in substantial gainful activity since August 13, 2013, the alleged onset date. (R. 41.)

At step two, the ALJ determined that plaintiff has the following severe impairments: "right shoulder impairment, status-post to right shoulder surgeries, and right elbow impairment." (*Id.*)

The ALJ explained that these impairments "cause more than a minimal effect on the claimant's ability to perform his physical or work activities." (*Id*.)

At step three, the ALJ concluded that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments set forth at 20 C.F.R. pt. 404, subpt. P, app. 1. (*Id.*)

Before considering step four, the ALJ determined plaintiff's RFC. The ALJ found that plaintiff has "the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant has limited use of his upper right extremity as follows: he is unable to lift overhead, cannot lift and carry more than 10 pounds, and can only lift up to chest level." (R. 41-42.)

In determining plaintiff's RFC, the ALJ (a) found plaintiff's testimony not entirely credible (R. 42); (b) accorded Dr. Levine's opinion testimony "great weight" (R. 45); (c) failed to give any weight to (or even consider) the opinion testimony of consultative examiner Dr. Fkiaras; and (d) accorded all other medical opinions in the record "little weight." (R. 44.)

As to the plaintiff's testimony, the ALJ found that his "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record" and that "his overall condition is not of disabling character." (R. 42.) The ALJ noted that Dr. Friedman had observed some improvement after plaintiff's initial surgery (R. 43); that in May 2014 plaintiff was experiencing "moderate" relief through twice-weekly physical therapy sessions (*id.*); that Dr. Hausknecht found "four out of five grip strength in the right hand" in April 2014; and that, other than some muscle atrophy in the shoulder, and pain in the right shoulder and elbow, plaintiff

"otherwise showed full muscle strength in the upper and lower extremities, normal muscle tone throughout the body." (*Id.*) The ALJ also noted that Dr. Schottenstein reported in June 2015 that a ganglion block procedure had resulted in 70% pain relief, and that as recently as January 2016, on examination by Dr. Schottenstein, plaintiff continued to show "a normal gait, full muscle strength throughout the body . . . and apart from some diminished sensation in the upper right extremity, no sensory defects." (R. 44.) The ALJ also considered a May 2016 x-ray report which revealed significant "translation" of the humoral head but "no evidence of AC joint arthrosis soft tissue abnormalities, and stated that [plaintiff's] bone mineral density appeared normal." (*Id.*)

The ALJ gave Dr. Levine's opinion great weight because it was "based on a thorough review of the medical record, detailed questioning of the claimant during the hearing, [and] a knowledge of Social Security's adjudicative process, and is consistent with the medical record as a whole." (R. 45.) The ALJ noted Dr. Levine's opinion that plaintiff was "limited to lifting and carrying 10 pounds, should not lift above chest level or reach above shoulder level, and that he is unable to push and pull" with his upper right extremity. (*Id.*) Notwithstanding the "great weight" he gave to Dr. Levine's testimony, however, in formulating plaintiff's RFC the ALJ did *not* place any limitation on plaintiff's ability to push or pull. Nor did he incorporate the other limitations that Dr. Levine described: that plaintiff was unable to "reach above shoulder level" or to engage in "any forceful grip, grasp, or torque activities" with his right upper extremity. (R. 110-12.)

The ALJ did not mention or address Dr. Fkiaras's opinion anywhere in the Decision. As to the remaining medical opinion evidence in the record, the ALJ expressly gave it little weight. (R. 44.) ALJ Grossman acknowledged that the record was "replete" with opinion evidence from plaintiff's treating physicians and/or worker's compensation doctors, but found all of them "either vague or conclusory in nature." (*Id.*) The ALJ noted that several physicians had opined on

plaintiff's "disability," including Dr. Friedman ("totally disabled"), Dr. Huang ("unable to return to work"), Dr. Kramberg ("25% 'temporary impairment'"), Dr. Katz ("'moderate partial disability"), Dr. Harris (echoing Dr. Katz), and Dr. Hausknecht ("100% temporary impairment"). (*Id.*) However, the ALJ reasoned, these physicians "either opined on a matter reserved for the Commissioner to determine, or are vague and fail to provide a specific function-by-function assessment of the claimant's limitations." (*Id.*)

At step four, the ALJ concluded that, given his RFC, plaintiff was unable to perform his past relevant work as an asbestos removal worker. (R. 45.)

At step five, the ALJ found that, considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that plaintiff can perform. (R. 45.) Citing VE Atkinson's testimony that plaintiff "would be able to perform the requirements of representative occupations such as an electronics worker [], office helper [], and information clerk" (R. 46) (DOT codes omitted), the ALJ noted that these jobs "exist in the national economy in the following numbers: 3,437 jobs (electronics worker), 3,728 jobs (office helper), and 1,609 jobs (information clerk)" – for a total of 8,774 jobs (*Id.*) The ALJ then concluded that the plaintiff was "capable of making a successful adjustment to other work that exits in significant numbers in the national economy" and therefore was "not disabled" within the meaning of the Act from August 13, 2013 through the date of the Decision. (R. 46.)

## V. ANALYSIS

### A. Standard of Review

Both parties have moved for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). To prevail on such a motion, a party must establish that no material facts are in dispute and that judgment must be granted to that party as a matter of law. *Sellers v. M.C. Floor Crafters, Inc.*, 842

F.2d 639, 642 (2d Cir. 1988); *Claudio v. Comm'r of Soc. Sec.*, 2017 WL 111741, at *1 (S.D.N.Y. Jan. 11, 2017).

The Act provides that the Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The reviewing court may set aside a decision of the Commissioner only if it is "based on legal error or if it is not supported by substantial evidence." *Geertgens v. Colvin*, 2014 WL 4809944, at *1 (S.D.N.Y. Sept. 24, 2014) (quoting *Hahn v. Astrue*, 2009 WL 1490775, at *6 (S.D.N.Y. May 27, 2009)); *accord Longbardi v. Astrue*, 2009 WL 50140, at *21 (S.D.N.Y. Jan. 7, 2009). Thus, where an applicant challenges the agency's decision, the district court must first decide whether the Commissioner applied the correct legal standards. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008). If there was no legal error, the court must determine whether the ALJ's decision was supported by substantial evidence. *Tejada*, 167 F.3d at 773; *Calvello*, 2008 WL 4452359, at *8.

"Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1970)). "In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Longbardi*, 2009 WL 50140, at *21 (citing *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) and *Williams v. Bowen*, 859 F.2d 255, 256 (2d Cir. 1988)). However, the reviewing court's task is limited to determining whether substantial evidence exists to support the ALJ's fact-finding; it may not reweigh that evidence or substitute its judgment for that of the ALJ where the evidence is susceptible of more than interpretation. "[O]nce an ALJ

finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise.*" *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quotation marks and citation omitted). Thus, the substantial evidence standard is "a very deferential standard of review – even more so than the 'clearly erroneous' standard." *Id.* (citation omitted); *see also Brown v. Colvin*, 73 F. Supp. 3d 193, 198 (S.D.N.Y. 2014).

"[T]he crucial factors in any determination must be set forth with sufficient specificity to enable [the reviewing court] to decide whether the determination is supported by substantial evidence." *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984). Thus, remand may be appropriate if the ALJ fails to provide an adequate roadmap for his reasoning. *Id.* But if the ALJ adequately explains his reasoning, and if his conclusion is supported by substantial evidence, the district court may not reverse or remand simply because it would have come to a different decision on a *de novo* review. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) ("Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence.") (citation and internal quotation marks omitted); *see also Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998) ("the court should not substitute its judgment for that of the Commissioner"); *Ryan v. Astrue*, 5 F. Supp. 3d 493, 502 (S.D.N.Y. 2014) ("[T]his Court may not substitute its own judgment as to the facts, even if a different result could have been justifiably reached upon *de novo* review.") (quoting *Beres v. Chater*, 1996 WL 1088924, at *5 (E.D.N.Y. May 22, 1996)).

## B.     The Parties' Positions

In this case, plaintiff argues that the ALJ failed "to meet his burden at step 5 to show that there are a 'significant number' of jobs that Plaintiff could perform" given his RFC, and that the ALJ's hypotheticals to the vocational expert "were not accurate," meaning that they did not

incorporate the limitations specified by Dr. Levine, thus invalidating VE Atkinson's testimony concerning the jobs that plaintiff could perform. *See* Pl. Mem. (Dkt. No. 15) at 25-26 (relying on *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984) ("In our view, the fact that these conditions were not included in the hypothetical question rendered that question defective, and thus the expert's answer cannot be considered substantial evidence.")). In his reply brief, plaintiff further argues that the ALJ erred by failing even to consider the opinion of Dr. Fkiaras, which also included limitations not incorporated into the ALJ's RFC. Pl. Reply Mem. (Dkt. No. 18) at 2.

The Commissioner counters that substantial evidence supports the ALJ's RFC determination, as well as the step five finding concerning available jobs. *See* Def. Mem. (Dkt. No. 17) at 15-24. Alternatively, defendant argues that even if it was error for the ALJ not to include all of plaintiff's limitations in his RFC determination, the error was harmless because it would not have changed the ALJ's ultimate determination. *Id.* at 22-23.

The Court largely agrees with plaintiff. It may well be, as the ALJ suggested during the first hearing, that "it's really hard to make out a case of disability" with nothing more than "limited use of [one] arm." (R. 84.) And it is true, as the ALJ noted in his Decision, that "apart from the impairment to his right upper extremity, the claimant denied having any other medical conditions that prevent him from working." (R. 42.) However, the reviewing court must set aside the agency decision if the ALJ committed legal error, *see Tejada v. Apfel*, 167 F.3d at 773, unless "application of the correct legal principles to the record could lead only to the same conclusion," *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010), rendering the errors harmless. In this case, the ALJ erred by failing – without explanation – to incorporate the limitations described by Dr. Levine into his RFC determination and by wholly ignoring the opinion of Dr. Fkiaris. Moreover, the omitted

limitations would have disqualified plaintiff from some of the jobs cited by the vocational expert (and relied on by the ALJ). The Court therefore cannot conclude that the errors were harmless.

## C. The ALJ's RFC Determination

### 1. Dr. Levine's Opinion

As noted above, the ALJ determined that plaintiff had the "residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant has limited use of his upper right extremity as follows: he is unable to lift overhead, cannot lift and carry more than 10 pounds, and can only lift up to chest level." (R. 41-42.) In formulating plaintiff's RFC, the ALJ relied primarily on the opinion of Dr. Levine, to which he assigned "great weight," with no reservations, in part because it was "consistent with the medical record as a whole." (R. 45.) However, the ALJ disregarded Dr. Levine's view that plaintiff could not push or pull, reach above shoulder level, or engage in "any forceful grip, grasp, or torque activities" with his right upper extremity. (*Compare* R. 41-42 *with* R. 110-12.) These additional limitations – referred to herein as the "push/pull, reach, and torque limitations" – were simply left out of the RFC, without explanation. (R. 45.)

This was error. As the Commissioner correctly notes, *see* Def. Mem. at 18-19, an ALJ is not required to "accept or reject a medical expert's opinion *in toto*. Some portions may be entitled to greater weight than other portions." *Annabi v. Berryhill*, 2018 WL 1609271, at *16 (S.D.N.Y. Mar. 30, 2018). "However, when the ALJ uses a portion of a given opinion to support a finding, while rejecting another portion of that opinion, the ALJ must have a sound reason for the discrepancy." *Id.* (quoting *Artinian v. Berryhill*, 2018 WL 401186, at *8 (E.D.N.Y. Jan. 12, 2018)). Here, the ALJ offered no reason at all for the discrepancy between Dr. Levine's opinion – which he appeared to accept *in toto* – and his determination of the plaintiff's RFC. He did not even acknowledge the variance. *See* Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *7 (1996) ("If the

RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."); *Kuleszo v. Barnhart*, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) ("The ALJ's failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.").

Moreover, the Commissioner does not point to any conflicting evidence in the record upon which the ALJ could have relied to reject the push/pull, reach and torque limitations articulated by Dr. Levine. *Cf. Veino v. Barnhart,* 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve."). In this case, all of the physicians who addressed the issue agreed that plaintiff could not push or pull with his upper right extremity: Dr. Schottenstein (R. 901); Dr. Katz (R. 728, 737); and Dr. Fkiaras, who also opined that plaintiff had "a moderate to severe limitation grabbing and squeezing with his right hand" and concluded that he should be restricted from all activities "which require use of his right upper extremity." (R. 483.) In the absence of any "genuine conflicts" in the medical evidence, *Veino*, 312 F.3d at 588, the Court cannot accept the Commissioner's contention that the ALJ's rejection of the push/pull, reach and torque limitations was based upon his consideration and resolution of such conflicts.

### 2. Dr. Fkiaras's Opinion

While Dr. Schottenstein and Dr. Katz evaluated plaintiff for workers' compensation purposes,[4] Dr. Fkiaras examined him on referral from the Division of Disability Determination,

---

[4] For this reason, the ALJ correctly disregarded their ultimate conclusions as to whether, and to what extent, plaintiff was "disabled." *See*, *e.g.*, *DeJesus v. Chater*, 899 F. Supp. 1171, 1177 (S.D.N.Y. 1995) ("[F]indings of disability for workers' compensation purposes are of limited utility for disability purposes under the Social Security Act."). However, an opinion as to whether a claimant can push or pull is a functional assessment, not a general disability conclusion, and as such should not be rejected simply because of the context in which the opinion is rendered. *See Urbanak v. Berryhill*, 2018 WL 3750513, at *25 (S.D.N.Y. July 18, 2018), *report and recommendation adopted*, 2018 WL 3745667 (S.D.N.Y. Aug. 7, 2018) ("The ALJ properly afforded 'little weight' to Dr. Jacobs' opinions that plaintiff was 100% disabled for purposes of workers' compensation and 'great weight' to his functional assessments and observations of

for purposes of his DIB application. (R. 480-83.) Nonetheless, Dr. Fkiaras's opinion goes wholly unmentioned in the ALJ's Decision. This was also error, because an ALJ must at least *consider* limitations identified by a consultative examiner, *see* 20 C.F.R. § 404.1527(c) ("we will evaluate every medical opinion we receive") and, if those limitations are rejected, must explain why. *See*, *e.g.*, *Hall v. Colvin*, 37 F. Supp. 3d 614, 627 (W.D.N.Y. 2014) (remanding where the ALJ failed to explain what weight the ALJ gave the opinion of a physician who performed a consultative examiner of the claimant); *Harnisher v. Apfel*, 40 F. Supp. 2d 121, 130 (E.D.N.Y. 1999) (remanding in part because "the ALJ failed to even mention the medical opinions of Dr. Mark Thomas, who performed a consultative exam on behalf of the Commissioner, and Dr. Michael Katz, who testified at the first administrative hearing."). ALJ Grossman may have discounted Dr. Fkiaras's opinion for any number of reasons. However, where the record gives no hint of those reasons – and does not even mention the consultative examiner's opinion – the Court cannot simply assume that the required consideration and analysis took place.

### D. Number of Jobs in the National Economy

As noted above, the ALJ presented two different hypotheticals to VE Atkinson. The first hypothetical asked the vocational expert to assume that the claimant could not use his right upper extremity at all (R. 121-22), thereby incorporating all of the limitations specified by Dr. Levine and Dr. Fkiaras. In response, however, Mr. Atkinson identified three jobs with relatively modest national employment figures (after erosion to account for the hypothetical claimant's limitations): usher (after 50% erosion, 2,412 jobs in the national economy); school bus monitor (after 60%

---

plaintiff during numerous physical examinations."); *Garcia v. Colvin*, 219 F. Supp. 3d 1063, 1075 (D. Colo. 2016) ("[W]hile it is true that workers' compensation standards differ from the Social Security disability standard, the limitations provided by a workers' compensation medical provider are relevant in determining a claimant's RFC.").

erosion, 432 jobs); and monitor (after 50-60% erosion, 1,823 to 2,279 jobs). (R. 123-25.) VE Atkinson was not asked for, and did not provide, regional or local employment figures for any of these three jobs. In sum, therefore, the record contains evidence of between 4,667 and 5,123 jobs in the national economy that could be performed by the first hypothetical claimant. This is not a "significant number." *See*, *e.g.*, *Hanson v. Comm'r of Soc. Sec.,* 2016 WL 3960486, at *13 (N.D.N.Y. June 29, 2016) ("Courts have held that [national] numbers around between [sic] 4,000 and 5,000 did not constitute "significant."), *report and recommendation adopted*, 2016 WL 3951150 (N.D.N.Y. July 20, 2016); *Hamilton*, 105 F. Supp. 3d at 231 (finding that three positions regionally and a total of 5,160 nationally did not constitute significant numbers); *Torres v. Colvin*, 2017 WL 1734020, at *3 (D. Conn. May 3, 2017) ("[I]t is clear to me that 756 laundry laborer jobs nationally does not constitute a significant number.").

In response to the second hypothetical – which corresponded to the ALJ's RFC determination[5] – VE Atkinson identified four additional jobs: electronics worker (3,437 jobs in the national economy); office helper (3,728 jobs); information clerk (1,609 jobs); and ticket taker (6,785 jobs). (R. 126-29) The vocational expert also noted that the second hypothetical claimant could "do the full . . . usher position" (4,823 jobs), thus providing evidence of a total of at least 20,382 jobs in the national economy that could be performed by an individual with the RFC that the ALJ formulated for the plaintiff in this case.

---

[5] The second hypothetical asked the vocational expert to assume that the claimant "can lift and carry 20 pounds with their upper extremity frequently, 10 pound – or, I'm sorry 10 – 20 pounds occasionally and 10 pounds frequently . . . [A]nd with the right arm can finger – this person no – okay, with the right arm this person is limited in the following manner. This person has no over-shoulder lifting and is limited – just a second, the person can lift ten pounds to the chest level, in other words no more than that, with no overhead lifting but the person can finger, handle, you know, fine manipulation frequently." (R. 121-22, 125-26.)

That number may indeed be "significant." *See Hanson* 2016 WL 3960486, at *13 ("Courts have held that numbers varying from 9,000 upwards constituted 'significant.'"); *Gray v. Colvin*, 2014 WL 4146880, at *6 (W.D.N.Y. Aug. 19, 2014) (holding that 16,000 jobs in the national economy was "significant"); *Gutierrez v. Comm'r of Soc. Sec.*, 740 F.3d 519, 529 (9th Cir. 2014) (characterizing 25,000 jobs in the national economy as a "close call" but affirming the ALJ's finding that 25,000 was "significant"). However, because ALJ Grossman's RFC determination was based on legal error, evidence that a person with such an RFC could perform work that exists in significant numbers in the national economy does not satisfy the Commissioner's burden at step five. *See Calabrese v. Astrue*, 358 F. App'x 274, 276–77 (2d Cir. 2009) (the ALJ "may rely on a vocational expert's testimony regarding a hypothetical *as long as* the facts of the hypothetical are based on substantial evidence.") (emphasis added).

### E.     Harmless Error

The Commissioner argues in the alternative that any error committed by the ALJ in formulating plaintiff's RFC was harmless because it "would have no impact on the outcome of the case." Def. Mem. at 22-23 (citing *Zabala*, 595 F.3d at 409). According to the Commissioner, "light work" generally does not require an employee to push and pull with "both hands bilaterally or with the dominant hand." Def. Mem. at 22. In other words, the Commissioner argues that any pushing or pulling required by the jobs identified by VE Atkinson in response to the second hypothetical (or by other jobs similarly classified as "light work") could be done one-handed, with the employee's non-dominant hand. The Court disagrees.

### 1.     Exclusion of Push/Pull, Reach and Torque Limitations

The Commissioner is correct that the omission of Dr. Levine's push/pull, reach and torque limitations would be harmless if that omission would not have affected his ultimate disability determination. *See, e.g.*, *Akey v. Astrue*, 467 F. App'x 15, 17 (2d Cir. 2012) ("The ALJ's failure to

include the limitation to unskilled and semi-skilled work is harmless because the only jobs the vocational expert identified were unskilled or semi-skilled."). However, the sources that the Commissioner cites do not stand for the proposition that the pushing and pulling contemplated in "light work" can generally be done with the non-dominant hand alone.

According to 20 C.F.R. § 404.1567(b), a job is considered "light work" when it requires "a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." Similarly, SSR 83-10, 1983 WL 31251 (S.S.A. 1983), notes that "light work" involves "sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances)." To be sure, some individuals who have lost the use an upper extremity "have been known to perform selected occupations at nearly all exertional levels." SSR 83-12, 1983 WL 31253 (S.S.A. 1983). The key phrase here, however, is "selected occupations." Once an individual's RFC is determined, a vocational expert may be required "to determine the size of the remaining occupational base, cite specific jobs within the individual's RFC, and provide a statement of the incidence of those jobs in the region of the individual's residence or in several regions of the country." *Id*. Nothing in these authorities permits the Court to assume that a right-handed claimant who cannot push, pull, reach, or engage in "any forceful grip, grasp, or torque activities" with his right upper extremity can nonetheless engage in "light work" in general, much less the specific jobs identified by VE Atkinson in response to the ALJ's second hypothetical.

The Court has also consulted the Department of Labor's Dictionary of Occupational Titles (DICOT),[6] which suggests that at least two of the jobs identified by VE Atkinson in response to the ALJ's second hypothetical could *not* be performed by an individual with push/pull, reach and torque limitations affecting his dominant upper extremity. *See* DICOT 726.687-010 ELECTRONICS WORKER ("Prepares wires for assembly by measuring, cutting, stripping, twisting, tinning, and attaching contacts, lugs, and other terminal devices, using handtools, and power tools and equipment."); DICOT 239.567-010 OFFICE HELPER ("May use office equipment, such as envelope-sealing machine, letter opener, record shaver, stamping machine, and transcribing machine.").

It is possible that the other jobs identified by the vocational expert could be performed by an individual with all of the limitations found by Dr. Levine. *See* DICOT 237.367-018 INFORMATION CLERK; DICOT 344.667-010 TICKET TAKER; DICOT 344.677-014 USHER. However, this Court will not substitute its own speculation for the testimony of a vocational expert on this point, particularly where the aggregate number of jobs available (nationally) in these three occupations – assuming no erosion at all as a result of the claimant's limitations – is only 13,217. As in *Rochek v. Colvin*, 2013 WL 4648340, at *12 (W.D. Pa. Aug. 23, 2013), "the better course here is for the Court to decline to find harmless error, and allow the appropriately evaluated . . . limitations of the RFC to be explicitly factored into the testimony of the VE, who enjoys the greatest expertise in this area."

---

[6] Courts regularly look to the description of jobs in DICOT to conduct harmless error analyses. *See*, *e.g.*, *Holloman v. Comm'r of Soc. Sec.*, 639 F. App'x 810, 816 (3d Cir. 2016); *Miller v. Berryhill*, 2018 WL 1885013, at *13 (M.D. Pa. Jan. 23, 2018), *report and recommendation adopted*, 2018 WL 822662 (M.D. Pa. Feb. 12, 2018).

## 2.     Failure to Consider the Opinion of Dr. Fkiaras

The ALJ's failure to consider the opinion of Dr. Fkiaras would also be harmless error if it could not have changed the outcome at the agency level. *Greek v. Colvin*, 802 F.3d 370, 376 (2d Cir. 2015); *Gemmell v. Comm'r of Soc. Sec.*, 2017 WL 3328237, at \*5 (N.D.N.Y. Aug. 2, 2017) ("[F]ailure to consider or weigh an opinion may be harmless error where consideration of that opinion would not have changed the outcome.") (collecting cases) (citations omitted). An ALJ's failure to consider a medical opinion is not harmless, however, where that opinion is significantly more favorable to the plaintiff than those that were considered, and is not otherwise covered by other record evidence. *See Sottasante v. Colvin*, 209 F. Supp. 3d 578, 594 (W.D.N.Y. 2016) (because "Dr. Tzetzo's statement is significantly more favorable to Plaintiff than other opinions in the record," the ALJ's "failure to address this opinion was not harmless"). Applying this standard, the Court cannot conclude that it was harmless error for ALJ Grossman to overlook Dr. Fkiaras's opinion.

Dr. Fkiaras included push/pull limitations similar to those of Drs. Levine, Katz, and Schottenstein, opining that plaintiff should be "restricted from any lifting, carrying, pushing, and pulling," and had "a moderate to severe limitation grabbing and squeezing with his right hand." (R. 483.) In addition, however, Dr. Fkiaras opined that plaintiff was "restricted from activities which require use of his right upper extremity." (*Id.*) This much broader restriction is not duplicative of other evidence in the record. Had it been considered and accepted by the ALJ, it would have resulted in a significantly more restrictive RFC. Moreover, there is no evidence in the record demonstrating that an individual with that RFC could perform work which exists in significant numbers in the national or local economy. To the contrary: as noted above, the ALJ's first hypothetical to the vocational expert, which assumed that the claimant could not use his right upper extremity, produced testimony identifying a maximum of 5,123 jobs in the national economy

that could be performed by such a claimant. (R. 123-25.) The error was therefore not harmless. *See Rousey v. Comm'r of Soc. Sec.*, 285 F. Supp. 3d 723, 742 (S.D.N.Y. 2018) (rejecting harmless error argument where "[t]he Commissioner [did] not explain[] how the ALJ's RFC finding or the hypothetical otherwise accounted for plaintiff's mental health limitations").

## VI.    CONCLUSION

For the foregoing reasons, plaintiff's motion is GRANTED, the Commissioner's motion is DENIED, and this action is REMANDED for further proceedings consistent with this Order.

Dated:  New York, New York
        November 14, 2018

**SO ORDERED.**

**BARBARA MOSES**
**United States Magistrate Judge**